# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01916-SCT

***DAMION LAFREDRICK PACE a/k/a DAMION
PACE a/k/a DAMION L. PACE a/k/a DAMIAN
LAFREDRICK PACE***

***v.***

***STATE OF MISSISSIPPI***

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/2011 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| TRIAL COURT ATTORNEYS: | ALI MUHAMMAD SHAMSIDDEEN |
| | MARK SHELDON DUNCAN |
| | STEVEN D. KILGORE |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JARED K. TOMLINSON |
| | DAMION L. PACE, PRO SE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; VACATED AND RENDERED IN PART - 05/10/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., KING AND COLEMAN, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Damion Lafrederick Pace was indicted for one count of burglary, two counts of kidnapping, one count of forcible rape, and one count of extortion. All five counts concerned events that occurred on the night of April 14, 2010. The jury was instructed on the elements of burglary, kidnapping, forcible rape, and extortion. The jury acquitted Pace of forcible rape,

but convicted him of one count of extortion, two counts of kidnapping, and one count of robbery, a crime for which Pace had not been indicted. The Circuit Court of Scott County sentenced him to twenty years for robbery, twenty years for each of the kidnappings, and ten years for extortion, with the sentences to run consecutively.

¶2.     Pace appeals, arguing that the circuit court erred by denying his motion for a directed verdict and that he received ineffective assistance of counsel. We hold that, because Pace was not indicted for robbery and robbery is not a lesser-included offense of the indicted crime of burglary, the trial court's entry of a judgment of conviction of robbery was a plain error that requires vacation of the robbery conviction and sentence. Therefore, we vacate and render the robbery conviction and sentence. We find that Pace's other issues are without merit.

**FACTS**

¶3.     Jessica Goodwin provided most of the testimony against Pace. Goodwin testified that, on April 14, 2010, she was living in the rural Lake community in Scott County with her four-month-old daughter, Melissa,[1] and Melissa's father, who was not present that night.[2] At about 10:00 or 10:15 p.m., Goodwin was preparing to bathe Melissa when she was startled by a masked man standing in the living room holding a gun. The man had entered through the unlocked back door. He demanded money and guns and, when Goodwin said she had none to give him, he forced her to rummage through her belongings. Later, this man was identified

---

[1] In accordance with this Court's policy, the name of the minor victim has been changed to protect her identity.

[2] Goodwin testified that she and the baby's father had married after the events at issue and before Pace's trial.

2

as Darrin Wilson. During the search, another masked and armed man, later identified as Devonte Hughes, appeared. Hughes and Wilson searched the house for items to steal. Then Wilson told Goodwin that she was coming with them.

¶4.     At gunpoint, Wilson and Hughes forced Goodwin, holding Melissa, out the back door and down the road, where a car was parked in the bushes. Wilson instructed Goodwin to get in the back seat. Then he got in the driver's seat and Hughes occupied the front passenger's seat. They rode back to Goodwin's house and, as they were leaving, she saw Pace, whom she recognized as a former high school classmate, standing in front of her house. Pace got into the back seat with her and slipped a mask over his face. Goodwin testified that, as they drove away, Hughes said "get the TV," but Wilson said "no" and kept driving. As they turned down another road, Pace leaned forward and announced that he was ready to have sex.

¶5.     Then, Wilson asked Goodwin whether she could obtain money, and Goodwin said she thought she could ask her father. Hughes, who had taken Goodwin's cell phone from the house, passed it to her, and she telephoned her stepmother, Angela Goodwin. Wilson told Goodwin to say that he wanted $2,000 and not to contact the police or he would kill her and her baby. Goodwin testified that she complied, but she had trouble communicating because Melissa was crying loudly. Angela Goodwin said that her stepdaughter was hysterical and Melissa was crying so loudly that she could barely understand what Jessica Goodwin was saying, so she handed the phone to Goodwin's father, Tim Goodwin. Tim Goodwin put the speaker phone on, and he and Angela heard Jessica Goodwin say that the men wanted $2,000 or she and Melissa would be killed. Then, Wilson demanded the phone from Goodwin and

3

told her to give Melissa to Pace and get out of the car. She complied. Tim Goodwin told Wilson that he did not have $2,000, so Wilson asked whether he wanted Goodwin and Melissa returned. Tim Goodwin told Wilson he had $500, and Wilson instructed him to put it in a paper bag and place it at the end of Good Hope Road. Tim Goodwin testified that he complied with this demand.

¶6.     Jessica Goodwin testified that, when the call ended, Wilson exited the car and she asked him if she could hold Melissa, who was crying. Wilson allowed her to take Melissa from Pace. Then, Wilson began touching Goodwin and she said "please don't do it." But Wilson forced her to turn around, pushed her against the car, and raped her at gunpoint as she held Melissa and the other two men watched. Then, Pace raped Goodwin against the car as she screamed, "please, no." Wilson then asked Hughes if he wanted to have sex with her, but he declined, so Wilson ordered Goodwin to pull up her pants and get in the car.

¶7.     Jessica Goodwin testified that they all got back in the car and Wilson drove to Johnstontown Road, where he stopped and let Pace and Hughes out. Then, Wilson drove farther down the road to a trailer home, parked in the driveway, and exited the vehicle. Goodwin observed several people outside the trailer. Wilson was gone for five to ten minutes, during which time Goodwin contemplated running away with Melissa, but decided it was too dangerous due to the high probability that they would be captured again. When Wilson returned, he telephoned Jessica Goodwin's father, who said he had dropped off the money. Then, Wilson drove Goodwin and Melissa to the end of Good Hope Road, where he took possession of a brown paper bag with $500 inside.

¶8.    After collecting the money, Wilson drove Jessica Goodwin and Melissa back to the residence on Johnstontown Road, then to a driveway that led to a pasture. He ordered Goodwin to get out of the car, whereupon she exited the car with Melissa, and Hughes walked toward them from the woods. Then, Wilson walked away in the direction from which Hughes had arrived. Hughes told Goodwin that things had gone too far and that it wasn't supposed to be like this. He also said that Wilson had said he was going to kill them, but Hughes would not let that happen. A few minutes later, Wilson returned with Pace. Wilson held a plastic bottle filled with liquid and ordered Goodwin to use it as a douche. Goodwin testified that when she complied, the liquid burned her private area. Wilson also demanded Goodwin's underwear, which she gave him. Then, everyone got back into the car, and Wilson called Goodwin's father and told him where he could find Goodwin and Melissa. He dropped off Goodwin and her baby one road away from her home, and her father promptly picked them up.  Goodwin's father drove them home, then her stepmother immediately took them to a hospital, where Goodwin underwent a sexual assault examination. Goodwin testified that her television set had been removed from her home.

¶9.    The next day, Pace was arrested, and, on April 16, 2010, he gave a statement to Officers Billy Patrick and Willie Anderson of the Scott County Sheriff's Department. Pace said that he had stayed outside while Wilson and Hughes went into Goodwin's house. He heard a woman's screams coming from inside the house, then Wilson emerged from the house holding Goodwin and her baby at gunpoint. Hughes brought a television set and a video game console out of the house and secreted them on the roadside. Then, Wilson and

Hughes got into the car and picked up Pace. Pace said that he whispered to Wilson and Hughes that he and Jessica Goodwin knew each other from school. Wilson parked in a pasture and called Goodwin's father to ask for money for the return of Goodwin and Melissa. Pace said that Wilson demanded $2,000 but "came down to" $1,000 and told Goodwin's father where to drop the money. Then, Wilson ordered Goodwin out of the car, and she handed Melissa to Pace, but when the baby did not stop crying, Pace returned her to Goodwin. Pace said that Wilson raped Goodwin as she held the baby, then "made me have sex with the lady also at gunpoint."

¶10. Pace said that, next, they drove to Johnstontown Road. Hughes and Pace exited the car and walked to Bridget Wilson's house, then Hughes borrowed a car from Pace's cousin and picked up the television set and video game console. When Hughes returned to Bridget Wilson's residence, Wilson, who had arrived at some point, said he was going to kill Jessica Goodwin. Resolved to prevent Wilson from killing her, Pace and Hughes got back into the car with Wilson and Goodwin. Wilson drove to a remote area and then Pace and Wilson left and obtained a bottle of vinegar from Wilson's mother's house. When they returned, Wilson ordered Goodwin to wash with it. When they got back into the car, Pace told Wilson to drop Goodwin off, and Wilson called Goodwin's father and told him where he had left her.

¶11. Pace presented the testimony of several witnesses including himself. Kathryn Moyse was a forensic DNA analyst who had compared DNA from the vaginal swab from Goodwin's sexual assault kit with DNA from buccal (oral) swabs taken from Wilson, Hughes, and Pace. Moyse testified that a single source profile was obtained from semen on

the vaginal swab, indicating that the semen on the swab was from a single person, and she had determined that this single source was Darrin Wilson.

¶12. Darrin Wilson, who was incarcerated for his crimes at the time of Pace's trial, testified that he had lived on Johnstontown Road all his life and had grown up with Pace. He testified that he and Jessica Goodwin had known each other for several months before the night in question and, in fact, met occasionally in secret to do drugs together. He testified that, the night of April 14, 2010, he and Goodwin had concocted and executed a plan to extort money from her father with the object of buying crystal methamphetamine. He also testified that he had consensual sex with Goodwin that night, but that Pace never had sex with her. At some point, he went to Bridget Wilson's house and talked with Pace and Hughes. On cross examination, he was asked about the baby, and he testified that Goodwin had the baby with her the entire time because she routinely brought the baby when they met to do drugs. He testified that Pace and Hughes had been with them for part of the night, but they had not known of the extortion plan. He denied that Hughes had taken Goodwin's television set or video game console. Wilson testified that, after he and Goodwin had gotten the money, Goodwin saw a car she thought was her boyfriend's and demanded to be dropped off immediately. Wilson also testified that he had been listening on an open cell phone line during Pace's police interview, and he never heard Pace confess. Instead, he overheard the officers promise Pace that if he signed a prewritten statement, he could go home.

¶13. Pace testified in his own defense, and his testimony mirrored the version of events provided by Wilson. Pace testified that he was eighteen years old on the night of the alleged

7

crimes. He said that he and Hughes had accompanied Wilson to a woman's house. Wilson went inside and later emerged with Goodwin and her baby. Then, they went to Bridget Wilson's house, where Wilson had left Hughes and Pace. Pace testified that he never saw Wilson with a gun, and he denied that he, Pace, ever had sex with Goodwin. Pace denied that Hughes had removed a television set or video game console from Goodwin's house. He said he was not involved in the conversation with Goodwin's father about money. Further, Pace testified, he never had confessed, and that what purported to be his signed confession was instead a prewrittten statement that the officers had coerced him to sign by holding a gun on him and promising that he could go home if he signed.

¶14. Pace's stepfather, Marcus Wilson, testified on behalf of Pace that he was present for Pace's interview with the police. Marcus Wilson said that he urged Pace to tell the truth, and listened as Pace gave his confession and witnessed the officer writing down what Pace said. He testified that Darrin Wilson is his nephew. He also testified that he lives about three miles away from Goodwin's house and that his niece, Bridget Wilson, lives down the street. Marcus Wilson testified that he was not home on the night of the crimes. Marcus Wilson did testify that Pace asked for an attorney during his interview.

¶15. Bridget Wilson testified that Pace and Hughes came to her house that night and stayed about thirty or forty-five minutes, then departed together. Lorenzo Pace testified that he saw Pace and Hughes at Bridget Wilson's house at about 9:00 or 10:00 p.m. on the night in question. They stayed about thirty or forty-five minutes. While they were there, Wilson came in, and shortly all three left together. He saw Pace and Hughes again at about 1:00 or 2:00

8

a.m., when Hughes called and asked him to get them from Pace's mother's house. Hughes's father, Lester Harper, also testified.

**DISCUSSION**

I. PACE'S CONVICTION OF THE CRIME OF ROBBERY WAS A PLAIN ERROR REQUIRING VACATION OF THE CONVICTION AND SENTENCE.

¶16. Pace's indictment charged him with the following crimes: Count One, burglary with the intent to commit larceny;[3] Count Two, the kidnapping of Jessica Goodwin; Count Three, the kidnapping of Melissa; Count Four, the forcible rape of Jessica Goodwin; and Count Five, extortion of $500 from Tim Goodwin by threatening to inflict bodily harm on Jessica Goodwin. The jury was instructed on aiding and abetting and on the elements of burglary with the intent to commit larceny, kidnapping, forcible rape, and extortion. The jury acquitted Pace of forcible rape. Regarding Count One, the jury's verdict form read: "Count 1 (Robbery) We, the jury find the defendant, Damion Lafredrick Pace, guilty as charged in Count One." The jury also found Pace guilty of the two kidnapping counts and extortion. The trial court polled the jury and all jurors agreed on the verdict.

¶17. On June 21, 2011, the trial court entered a judgment of acquittal of forcible rape. The same day, the trial court entered a separate judgment of conviction that recited *verbatim* the

---

[3] Count One charged that Pace "did willfully, unlawfully, feloniously and burglariously break and enter a certain building located in Scott County, Mississippi, commonly known as, called and being a dwelling house of the property of Jessica Goodwin, with the willful, unlawful, felonious and burglarious intent to take, steal and carry away certain goods, wares and chattels located in said dwelling house and being the personal property of Jessica Goodwin and kept therein for her use and deposit, contrary to and in violation of Section 97-17-23, Miss. Code Ann. (1972), as amended[.]"

9

jury's verdict form, including "Count I (Robbery) We, the Jury, find the Defendant, DAMION LAFREDERICK PACE, guilty as charged in Count I." This judgment shows that the trial court sentenced Pace to twenty years for Count I, twenty years for Count II, twenty years for Count III, and ten years for Count V, to run consecutively. What the judgment communicates regarding Count One is that Pace was charged with "COUNT I - BURGLARY OF A DWELLING HOUSE," but convicted of "Count I (Robbery)."

¶18.    On August 19, 2011, Pace's defense counsel, Ali Shamsiddeen, filed a letter of withdrawal announcing that he had ceased representation of Pace, that he would not be handling the appeal, and requesting that the trial court appoint appellate counsel for Pace.[4] On August 23, 2011, the trial court entered an order that amended the judgment of conviction, providing that

> The Defendant was indicted for the crime of burglary of a dwelling house and forcibly taking contents from the house. The jury did not return a verdict of household burglary but returned a verdict of guilty of robbery. Therefore pursuant to the verdict of the jury the Defendant is charged with the crime of robbery. The remaining portions of the Order entered on June 23, 2011 will remain as stated therein.

The record does not indicate what brought the discrepancy to the trial court's attention and prompted its entry of the order amending the judgment of conviction.

---

[4] No order from the trial court allowing Attorney Shamsiddeen to withdraw appears in the record. Mr. Shamsiddeen did not file post-trial motions or a notice of appeal. Pace, *pro se*, initiated these appellate proceedings by filing a late notice of appeal on November 20, 2015. After Pace responded to a show-cause notice issued by this Court, we suspended Mississippi Rule of Appellate Procedure 4 and allowed Pace's untimely appeal to proceed.

¶19.    A review of the amended judgment of conviction reveals two apparent purposes. First, it adjudicated that Pace stood convicted of robbery, not burglary. Second, with the language "pursuant to the verdict of the jury the Defendant is charged with the crime of robbery," the trial court seems, in effect, to have undertaken to amend Pace's indictment to change the charge of burglary to one of robbery, in an effort to make the charge conform to the jury's verdict. Although Pace challenges the sufficiency of the evidence supporting all of the convictions, neither he nor the State has addressed the fact that Pace was judged to have been convicted of robbery, a crime for which he had not been indicted.

¶20.    When a defendant's substantive or fundamental rights are affected, this Court will notice "a plain error not identified or distinctly specified." M.R.A.P. 28(a)(3); *Foster v. State*, 148 So. 3d 1012, 1018 (Miss. 2014). "Under the plain-error doctrine, 'there has to be a finding of error, and that error must have resulted in a manifest miscarriage of justice for reversal to occur.'" *Id.* We will find plain error if the trial court has deviated from a legal rule, the error is plain, clear, or obvious, and the error prejudiced the outcome of the proceedings. *Id.* (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)).

¶21.    Both the federal and state constitutions require an indictment by a grand jury before a citizen can be prosecuted for a felony, absent waiver. U.S. Const. Amend. V; Miss. Const. Art. 3 § 27; *State v. Berryhill*, 703 So. 2d 250, 258 (Miss. 1997). A jury can return a verdict on the charged offense or on a lesser-included offense. Miss. Code Ann. § 99-19-5 (Rev. 2015). This Court has recognized that "only a grand jury can advise a defendant of what he is to be charged with." *Berryhill*, 703 So. 2d at 257 (citing *Stirone v. United States*, 361 U.S.

11

212, 218, 80 S. Ct. 270, 273-74, 4 L. Ed. 2d 252 (1960) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."). A court is not empowered to alter or amend the substance of an indictment returned by the grand jury. *Berryhill*, 703 So. 2d at 257.

¶22. Pace's indictment charged him with burglary with the intent to commit larceny, and the jury was instructed on the elements of burglary with the intent to commit larceny. The crime of robbery was not alleged in the indictment, and the jury was not instructed concerning that crime. But the jury returned the following verdict: "Count I (Robbery) We, the Jury, find the Defendant, DAMION LAFREDERICK PACE, guilty as charged in Count I." According to Uniform Rule of Circuit and County Court Practice 3.10, "If a verdict is so defective that the court cannot determine from it the intent of the jury, the court shall, with proper instructions, direct the jurors to reconsider the verdict. No verdict shall be accepted until it clearly reflects the intent of the jury." URCCC 3.10.[5] "The general rule is that the court may require the jury to clear up an indefinite and ambiguous verdict, and, '[i]ndeed, it is the duty of the court to direct the jury to reconsider their verdict when satisfied that there has been a palpable mistake.'" *Anderson v. State*, 231 Miss. 352, 359-60, 95 So. 2d 465, 467 (1957).

---

[5] Rule 3.10 of the Uniform Rules of Circuit and County Court Practice was in effect at the time of Pace's trial. Jury verdicts in criminal cases now are governed by Rule 24 of the Mississippi Rules of Criminal Procedure, which became effective July 1, 2017.

12

¶23.   When the jury returned a verdict of guilty of the unindicted crime of robbery, the trial

court did not consider whether the verdict was ambiguous or mistaken and then determine

whether to return the jury to deliberations to reconsider its verdict. Instead, the trial court

found that the jury's intent had been to convict Pace of robbery; accordingly, it entered a

judgment of conviction of robbery. Later, in the amended judgment of conviction, the trial

court reiterated that Pace had been convicted of robbery and added that the jury's verdict had

"charged" him with robbery. Because a court cannot make, alter, or substantively amend a

felony indictment, and only the grand jury can return an indictment, the trial court plainly

erred by finding that the *petit* jury's verdict had charged Pace with robbery. *See **Berryhill***,

703 So. 2d at 257. And because Pace had been indicted for burglary, not the entirely distinct

crime of robbery, and robbery is not a lesser-included offense of burglary, Pace could not be

convicted of robbery.[6] Pace's conviction of robbery, a crime for which he neither had been

indicted nor had he waived indictment, was a plain, clear, and obvious error that violated his

fundamental rights under the United States Constitution and the Mississippi Constitution and

constituted a manifest miscarriage of justice. Therefore, we hold that Pace's purported

---

[6] The crimes of robbery and burglary have different elements. According to the robbery statute, "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery." Miss. Code Ann. § 97-3-73 (Rev. 2014). And pursuant to the applicable burglary statute, "Every person who shall be convicted of breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein, shall be punished by commitment to the custody of the Department of Corrections for not less than three (3) years nor more than twenty-five (25) years." Miss. Code Ann. § 97-17-23(1) (Rev. 2014).

conviction of robbery was a plain error, and we render judgment, vacating Pace's conviction of robbery.

> II. WHETHER THE TRIAL COURT ERRED BY DENYING PACE'S MOTION FOR A DIRECTED VERDICT.

¶24. The sufficiency of the evidence is challenged with a motion for a directed verdict, a request for a peremptory instruction, or a motion for judgment notwithstanding the verdict (JNOV). *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). After the State rested its case, Pace moved for a directed verdict, challenging the sufficiency of the evidence. The trial court denied the motion. Pace then proceeded to present the defense case. On appeal, Pace argues that, because the State's evidence was insufficient to support a guilty verdict, the trial court erred by denying his motion for a directed verdict.

¶25. Pace failed to renew his motion for a directed verdict at the close of evidence or request a peremptory instruction. Moreover, he did not file a post-trial motion for JNOV. "When the defendant proceeds with his case after the state rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict." *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995). "In the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, [the defendant] has waived the sufficiency error on appeal." *Id.* Pace did not preserve his challenge to the sufficiency of the evidence for appeal because he did not renew his motion for a directed verdict at the close of evidence, request a peremptory instruction, or file a motion for JNOV. Because Pace failed to preserve this argument, it was waived.

14

III. WHETHER PACE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

¶26. Pace, with new appellate counsel, argues that he received ineffective assistance of counsel for two reasons. First, he complains of defense counsel's failure to move for a directed verdict or file a post-trial motion for JNOV or a new trial. Second, he argues that defense counsel did not object to the admission of his confession and offer the testimony of Marcus Wilson that Pace had requested an attorney during his police interview.

¶27. A criminal defendant has a state and federal constitutional right to the effective assistance of counsel. U.S. Const. Amend. VI; U.S. Const. Amend. XIV; Miss. Const. Art. 3, § 26; *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prove ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052. To show deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. 2052. But a strong presumption exists that counsel's performance constituted trial strategy and was "within the wide range of reasonable professional assistance." *Id.* at 689, 104 S. Ct. 2052. Prejudice is demonstrated by a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. 2052.

¶28. Ordinarily, claims of ineffective assistance of counsel are not addressed on direct appeal. *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003) ("[i]t is unusual for this [C]ourt to consider a claim of ineffective assistance of counsel when the claim is made on direct

appeal," because "there is usually insufficient evidence within the record to evaluate the claim"). "Where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Id.* But if the defendant is represented by counsel who did not represent him at trial, and the facts supporting the claim are fully apparent from the appellate record, the Court may address the issue. M.R.A.P. 22(b). Because both of Pace's claims of ineffective assistance of counsel are based on facts fully apparent from the record, we proceed to review them.

*A. Failure to File Post-trial Motions*

¶29. Pace argues that trial counsel's failure to renew the motion for a directed verdict, to move for a peremptory instruction, or to file post-trial motions deprived him of the effective assistance of counsel. He claims the failure prejudiced him because it deprived the judge of the opportunity to review the weight and sufficiency of the evidence after all evidence had been presented.

¶30. This Court has found that a defense attorney's failure to file post-trial motions challenging the weight and sufficiency of the evidence constituted deficient performance. *Holland*, 656 So. 2d at 1197-98. In *Holland*, the Court found that the error had prejudiced the defendant because the evidence had been insufficient to sustain the conviction; thus a reasonable probability existed that the trial court would have granted a motion for a JNOV. *Id.* at 1198. In *Parker v. State*, 30 So. 3d 1222, 1235 (Miss. 2010), defense counsel moved for a directed verdict at the close of all evidence that preserved the defendant's sufficiency

16

argument, but rendered deficient performance by neglecting to file a post-trial motion challenging the weight of the evidence. Because the verdict was not against the overwhelming weight of the evidence, the Court held that Parker had not shown any prejudice from the error. *Id.* Recently, in *Giles v. State*, 187 So. 3d 116, 125-26 (Miss. 2016), this Court, relying on *Holland*, found that counsel had rendered deficient performance by failing to file post-trial JNOV and new trial motions, but that the deficiency had not prejudiced Giles because the weight and sufficiency of the evidence were such that there was no reasonable probability that either motion would have been granted.

¶31.    As in *Holland*, *Parker*, and *Giles*, the failure of Pace's counsel to file post-trial motions attacking the weight and sufficiency of the evidence constituted deficient performance. There was no strategic reason for the lawyer's failure to file any post-trial motions. Nonetheless, Pace has not shown that any prejudice resulted from the failure, because, as discussed below, there is no reasonable probability that either motion would have been granted.

¶32.    On review of the sufficiency of the evidence, "the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." *Swanagan v. State*, 229 So. 3d 698, 703 (Miss. 2017) (quoting *Fagan v. State*, 171 So. 3d 496, 503 (Miss. 2015)). If any rational trier of fact could have found each element of the crime beyond a reasonable doubt, the Court will affirm. *Swanagan*, 229 So. 3d at 703 (quoting *Fagan*, 171

17

So. 3d at 503). "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Swanagan v. State*, 229 So. 3d 698, 705 (Miss. 2017).

¶33. Pace's convictions of two counts of kidnapping and one count of extortion were based on the theory that he was an aider and abettor to the crimes. "Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will" is guilty of kidnapping. Miss. Code Ann. § 97-3-53 (Rev. 2014). "A person is guilty of extortion if he purposely obtains or attempts to obtain property of another or any reward, favor, or advantage of any kind by threatening to inflict bodily injury on any person . . . ." Miss. Code Ann. § 97-3-82(2) (Rev. 2014). Under Mississippi Code Section 97-1-3, "[e]very person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not." Miss. Code Ann. § 97-1-3 (Rev. 2014). "Any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Hoops v. State*, 681 So. 2d 521, 533 (Miss. 1996). However, the defendant's mere presence when another person suggests possible future criminal activity does not create

18

criminal liability as an aider and abettor. ***Clemons v. State***, 482 So. 2d 1102, 1106 (Miss. 1985).

¶34.    Pace does not dispute that Marcus Wilson and Devonte Hughes committed the crimes. His argument is that the evidence was insufficient to have enabled a rational jury to conclude, beyond a reasonable doubt, that his participation amounted to more than being merely present while others suggested possible future criminal activity. Pace points out that he was never inside Goodwin's home, he did not remove Goodwin and her baby from the home at gunpoint, and he did not call Goodwin's father to extort money. However, Pace confessed to his involvement in the crimes of kidnapping and extortion. And Goodwin's testimony established that, while Pace did not commit the acts of kidnapping and extortion himself, he accompanied and encouraged Wilson and Hughes. Goodwin's testimony and Pace's confession largely corroborated each other with regard to the detailed events of the night. Therefore, no reasonable probability exists that the trial court would have granted Pace's motion for JNOV. Nor is there a reasonable probability that the trial court would have found that the evidence preponderated so heavily against the verdict that the verdict was against the overwhelming weight of the evidence. We find that Pace has not shown that trial counsel's failure to file post-trial motions violated his constitutional right to the effective assistance of counsel.

> *B. Failure to Challenge the Admission of the Confession and Present Witness Testimony*

¶35.    Next, Pace argues that his trial counsel rendered  ineffective assistance by failing to object to the admission of his confession and present the testimony of Pace's stepfather,

19

Marcus Wilson. Pace did not move to suppress his confession. The State sought to admit the confession during the testimony of Officer Patrick. At that point, the trial court excused the jury, and then the State presented the testimony of the two officers who had been present during the interview with Pace. They testified that Pace had waived his *Miranda*[7] rights and that no threats or promises had been made to secure his confession. Both officers also testified that neither Pace nor Marcus Wilson, who had been present during the confession, had asked for an attorney. At the conclusion of the officers' testimony, defense counsel declined to present any evidence or argument, saying "We have no objection." At that point, the trial court ruled that the confession was admissible because Pace knowingly and voluntarily had waived his *Miranda* rights and voluntarily had given his statement.

¶36.    On appeal, Pace argues that trial counsel was ineffective because he did not object to the admission of the confession and present the testimony of Marcus Wilson. During Marcus Wilson's direct examination by defense counsel at trial, he said that he had been present during Pace's confession, and he gave the following testimony:

Q. Okay. Was there mention of a lawyer at any time?

A. Well, Damion had said he wanted a lawyer, you know.

Q. Okay. And what happened?

A. It never – it wasn't none.

Q. Okay. Were you willing to provide a lawyer for him?

A. At the time we couldn't, sir, you know, not at the time we couldn't. You know, if it was really to do it, if I could, I would, you know.

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶37.    In *Shinstock v. State*, 220 So. 3d 967, 971 (Miss. 2017), the defendant argued that trial counsel had been ineffective by failing to file a motion to suppress. Because an attorney's mere failure to file a motion to suppress is not ineffective assistance, we declined to review the issue, holding that the record did not reflect ineffective assistance of counsel and the claim was more appropriately brought during post-conviction proceedings. In this case, Pace does more than merely allege that trial counsel was ineffective for failing to seek exclusion of the confession. He argues that, if trial counsel had sought exclusion of the confession, he would have been successful in that endeavor due to Marcus Wilson's testimony. Thus, he contends, he was prejudiced by trial counsel's deficiency in failing to object to the confession and present Marcus Wilson's testimony that Pace had asked for a lawyer during the police interview.

¶38.    "Generally, decisions to make or forego certain motions fall within the ambit of trial strategy and will not constitute ineffective assistance." *Crawford v. State*, 218 So. 3d 1142, 1161 (Miss. 2016).  But "[c]ounsel may be deemed ineffective where counsel fails to move to suppress evidence obtained in violation of the accused's constitutional rights if the petitioner shows that the motion would have been meritorious and that prejudice resulted from the evidence's admission." *Id.* (citing *Davis v. State*, 743 So. 2d 326, 336 (Miss.1999)). The accused has been prejudiced if there is a reasonable probability that the outcome of the trial would have been different without the evidence. *Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017). Pace contends that his presentation of Marcus Wilson's testimony at a suppression hearing would have resulted in the exclusion of the confession.

¶39. If the accused requests counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981). Before a confession is admitted, the State has the burden to prove beyond a reasonable doubt that *Miranda* warnings were given and that the accused gave a knowing, voluntary, and intelligent waiver. *Chamberlin v. State*, 989 So. 2d 320, 332 (Miss. 2008). The determination of whether a confession is admissible is a factual inquiry made by the trial judge from the totality of the circumstances. *Kircher v. State*, 753 So. 2d 1017, 1023 (Miss. 1999).

¶40. Because Officer Patrick and Officer Anderson testified at the admissibility hearing that neither Pace nor Marcus Wilson had asked for an attorney at any time, their testimony supported the trial court's finding that Pace's rights waiver was knowing, intelligent, and voluntary. If Marcus Wilson had testified, the trial court would have had before it contrary testimony indicating that Pace had invoked his right to counsel. But in light of the officers' testimony that neither Pace nor his stepfather ever asked for an attorney, the trial court would have been free to have rejected Marcus Wilson's testimony even if it had been presented. Because the trial court could have relied on or rejected Marcus Wilson's testimony, Pace has not shown that the trial court would have excluded the confession but for counsel's alleged error. Therefore, Pace has not shown that trial counsel rendered ineffective assistance of counsel by failing to object to the admission of the confession and present Marcus Wilson's testimony.

**CONCLUSION**

¶41. We hold that, because Pace was not indicted for robbery and the crime of robbery is not a lesser-included offense of the indicted crime of burglary, the trial court's entry of a judgment of conviction of robbery was a plain error that requires vacation of the robbery conviction and sentence. But we affirm his convictions of two counts of kidnapping and one count of extortion. Pace's argument that the trial court erred by denying his motion for a directed verdict is procedurally barred. And his claims of ineffective assistance of counsel are without merit; he has not shown he was prejudiced by counsel's failure to file post-trial motions, and he cannot show that his confession would have been excluded had trial counsel objected to its admission and called his stepfather as a witness. We affirm in part and we vacate and render in part the judgment of the Circuit Court of Scott County.

¶42. **AFFIRMED IN PART; VACATED AND RENDERED IN PART.**

**WALLER, C.J., RANDOLPH, P.J., KING, COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**